## Case No. 4,039.

### DOWELL v. CARDWELL et al.

[4 Sawy. 217.] [1]

District Court, D. Oregon. April 6, 1877.

LIEN OF AGENT—ASSIGNMENT OF CLAIM — CLAIM, DEFINITION OF—PLEA IN ABATEMENT—LIEN OF AGENT AS AGAINST THIRD PERSON — HOW ENFORCED.

1. An agent employed to collect a claim against the United States for a certain per centum of the amount realized, whether in bonds, drafts or cash, has a lien upon the fund for his compensation.

2. An assignment of such claim to such agent absolute upon its face, but made in fact to enable him to collect the same in his own name, is nevertheless an assignment of so much of the claim as the agent is entitled to retain as compensation.

3. The term "claim," as used in section 3477 of the Revised Statutes. does not include claims for supplies furnished the Oregon expedition to protect the emigrants of 1854; at least after the act of congress providing for their payment.

4. A plea in abatement pleaded with matter to the merits is considered waived or abandoned.

[Cited in Collinson v. Jackson, 14 Fed. 309.]

5. Where an agent has a lien upon a fund for a certain compensation for his services, either by virtue of his agency or an assignment pro tanto, he may sue in equity to enforce his rights therein against a third party receiving the same with notice thereof.

6. Where the principal of such agent is an administrator, the latter is not bound to present his demand to him for allowance or rejection before commencing suit against such third party, the latter's liability being wholly dependent upon his own acts, and not those of the administrator.

[This was a suit by B. F. Dowell against James A. Cardwell and W. C. Griswold.]

Addison C. Gibbs and plaintiff in pro. per., for plaintiff.

Walter W. Thayer and Richard Williams, for defendant.

DEADY, District Judge. This suit was commenced on November 16, 1874. in the circuit court for the county of Jackson. and on March 27, 1876. as to the defendant Griswold, was removed into this court. The transcript was filed in this court on January 9, 1877. It was heard in this court on the pleadings and proofs made and taken in the state court. The plaintiff seeks to recover the one-half of the sum of $2,580, alleged to have been wrongfully received by the defendant Griswold from the United States. on November 9, 1874, on account of supplies furnished by Wallace A. Gridley, deceased, to Company A of the ninth regiment of Oregon militia, in the summer of 1854. the plaintiff claiming a lien upon the fund for that amount for services and expenses in procuring an appropriation by congress to pay what might be due upon the claim, and procuring its allowance by the department.

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

The testimony is very voluminous, and covers a wide range both as to time and transaction. The material facts appear to be as follows: On July 17, 1854, upon the representation of Charles S. Drew, quartermaster-general of the Oregon militia, and others of Jackson county, the then governor of the territory, John W. Davis, directed the colonel of the ninth regiment of said militia, John E. Ross, to call into service volunteers for the protection of the immigrants coming into Oregon by the southern trail. In pursuance of this order, a company of volunteers was organized under the command of Captain Jesse Walker, and mustered into service by said Ross, as Company A of said regiment of militia. On August 8, 1854, the company, seventy-one strong, rank and file, proceeded upon the emigrant trail to the vicinity of Goose lake, sending detachments as far as Humboldt. and after an absence of about three months returned to Jacksonville, and was discharged without the loss of a man. This expedition attracted some attention in its day, and is the same that was sometimes characterized by such as lacked faith in the disinterestedness of those who promoted it, as "the expedition to fight the emigrants" rather than the Indians. The money and material necessary to equip and transport the command were furnished by the people of the vicinity with a view of bringing the immigration into that part of the territory, and in the expectation that congress would make an appropriation to pay the indebtedness incurred in the operation. Vouchers in due form were issued by Drew for supplies furnished. Among others, there were issued on September 15 and August 3, to Wallace A. Gridley, two vouchers, for $2.580 in the aggregate, on account of twelve beeves furnished the quartermaster, at thirty cents per pound, "for the use of Company A, mounted volunteers of the ninth regiment, Oregon militia, enrolled into the United States service to protect emigrants through that portion of Oregon territory which is now, as heretofore, inhabited by numerous tribes of hostile Indians." The amount of indebtedness incurred by the expedition for supplies, transportation, and employees, was about $45,000, for which Drew, as quartermaster and commissary, issued vouchers. The plaintiff accompanied it and furnished the larger portion of the supplies and transportation.

On February 2, 1871, "An act to pay two companies of Oregon volunteers" (16 Stat. 401) became a law without the approval of the president. This act provided: "That the act of congress entitled 'An act to authorize the secretary of war to settle and adjust the expenses of the Rogue River Indian war.' approved July 17, 1854 [10 Stat. 307], be and the same is hereby extended to the two companies of Oregon volunteers commanded by Captains Jesse Walker and Nathan Olney, called into service to suppress Indian hostilities in Oregon in 1854." By the act hereby

extended to Walker's company, it was provided: "That the secretary of war be and he hereby is authorized to adjust and settle, on just and equitable principles, all claims for services rendered in the late war with the Rogue River Indians in Oregon, known as the Rogue River war, according to the muster-rolls of the same; also for subsistence, forage, medical stores and expenditures, as well as for other necessary and proper supplies furnished for the prosecution of said war; and that on such adjustment (the same shall) be paid out of any moneys in the treasury not otherwise appropriated." 10 Stat. 307. Soon after the return of the expedition, the plaintiff commenced operations to procure its recognition and the payment of its expenses by congress. In 1856, he first went to Washington on this business, and thenceforth for the next fifteen years he spent much time and money there, and in going to and fro, in this behalf. He wrote and published petitions and arguments, procured evidence and memorials from the territorial legislature, labored with committees and members of congress, and in many and effective ways worked long and diligently to procure an appropriation for this purpose. The result was the passage of the act of February 2, 1871 [16 Stat. 401], which was mainly due to his pertinacious industry and energy.

In 1856, the plaintiff made a verbal contract with Gridley, by which the latter placed his vouchers in the hands of the former for collection, and agreed to pay the plaintiff a reasonable fee for his services, and contribute his proportion of the expense of procuring an appropriation and the payment of his claim. On September 3, 1859, Gridley died, leaving as his heirs at law a widow, Sarah, and five minor children. On November 7, 1859, letters of administration upon the estate of Gridley were duly issued to his widow. Soon after, the administratrix renewed the contract with the plaintiff to procure the payment of the Gridley vouchers, the same being modified so that it was agreed that the latter should have a proportionate share of his expenses and a "big fee" for his services, both not to exceed in any event one-half of the amount realized, and not otherwise, "whether paid in bonds, drafts or cash." At this time these claims for supplies and transportation furnished Walker's company had no particular value. Only a few persons were interested in them, and there was but little faith in their ultimate payment. The expedition itself had been publicly denounced as a mere private speculation under the guise of the public good. Subsequently. Sarah Gridley married Benjamin Stephens, and thereby her appointment as administratrix was superseded by operation of law; not, however. until the estate was substantially administered. After the passage of the act of February 2, 1871, namely: on September 8, 1871, the defendant James A. Cardwell, at the instance of the plaintiff and said Sarah Stephens, was appointed administrator de bonis non of the estate of said Gridley, for the purpose, particularly, of enabling him to give the plaintiff formal authority to collect and receive what was due the estate from the United States on these vouchers. On November 21, 1871, Cardwell gave the plaintiff a duly executed power of attorney, thereby authorizing him to demand and receive for him and in his name all sums due on account of the supplies furnished by said Gridley for the use of Walker's company in 1854; and on March 18, 1874, said Cardwell gave the plaintiff another power of attorney, which was "irrevocable," and by which, for the sum of $1 and other considerations, he transferred and conveyed the same to him.

Upon the passage of the act of February 2, 1871, the plaintiff procured proof of the value of the supplies and transportation furnished Walker's company, and prosecuted the allowance of his own and Gridley's claim before the proper department at Washington. In April, 1871, he was allowed $18,288.33 on his own demand, and the defendant Griswold as assignee of B. J. Drew, a brother of the quartermaster Drew, was allowed about the same time the sum of $15,556.50. Soon after this, Griswold, as the assignee and attorney of Chester and Jesse Robinson, appears to have presented claims to the department as a part of the expenses of the expedition, amounting to $22,003.56—by far the greater part of which appear to have been forged or fictitious—thus swelling the total amount of the expense to about $65,-000, while the act making the appropriation had been passed upon the affidavit of the plaintiff that the whole expense of the expedition did not exceed $45.000. See Sen. Ex. Doc. No. 24, 3d Sess. 42d Cong. p. 32. Attention having been called by some means to the probable falsity of these claims, and the original abstracts of Quartermaster Drew not being produced, the payment of claims on account of the expedition of 1854 was peremptorily stopped by the war department until about January 20, 1874. when $21.064.88 of said fictitious claims were allowed and paid to Griswold. In the meantime the plaintiff denounced these new claims as fraudulent, and procured and tendered to the department convincing evidence to that effect. Afterward, and while these claims were still under embargo in the·department, the plaintiff procured himself to be appointed administrator of the estate of one Thomas J. O'Neal, by the proper court of Jackson county, and presented a claim at the treasury department, as such administrator, for an allowance for the use of rigging on pack animals in the Oregon Indian war of 1855–6. Subsequently O'Neal turned up, and the defendant Griswold, upon the affidavit of O'Neal, procured an order, on March 16, 1874, from the secretary of the treasury (Richardson) to the effect that the plaintiff would "not be recognized as an attorney for the

prosecution of claims" before that department until otherwise ordered. Afterward, on September 18, 1874, it satisfactorily appearing that the plaintiff's action in the premises was had in good faith and that he was honestly mistaken, Secretary Bristow rescinded this order. On May 5, 1874, Griswold induced the defendant Cardwell, as administrator, to sell and assign the Gridley demand to him by a duly executed assignment and power of attorney of that date. Prior to the passage of the act making the appropriation to pay these claims, two of the children of Gridley had died, unmarried and without issue, and a few days before the assignment by Gridley to Griswold the latter had in fact purchased the three-sixths interest of Sarah Stephens, and the two-sixths interest of her two adult sons in the claim, for about $1,200. Besides, being administrator, Cardwell was the guardian of the third and minor child of Gridley, and although in form and in law he sold the whole claim as administrator to Griswold, yet, in fact, he only disposed of and received pay for the one-sixth thereof, the interest of said minor child therein. Altogether, Griswold paid between $1,500 and $1,600 for the claim. These parties were induced to make this sale, and Cardwell to execute this assignment and power, by the representations of Griswold, to the effect that the plaintiff could not collect any claims at Washington, because he was indebted to the United States in the sum of several thousand dollars for overpayment on his own claims, which he refused to refund, and because he had been disbarred from prosecuting claims in the treasury department; and by giving said Cardwell a bond to indemnify him against any liability which he might thereby incur to the plaintiff. At the time the defendant Griswold made these representations the plaintiff was not in fact indebted to the United States for overpayments or otherwise in any sum. But about November, 1871, when payment of the 1854 Oregon claims had been stopped, as above stated, and the same referred to a clerk of the war department, Thomas H. Bradley, for special examination, this officer reported that the plaintiff had been overpaid on his individual claim aforesaid in the sum of $6,158. Afterward, on January 19, 1874, he ascertained that such overpayment only amounted to $497, which sum the plaintiff refunded on March 18, 1874. Before this time the plaintiff had offered to set off a like amount of this or other claims then and for long justly due him against this demand, which offer was arbitrarily refused. Neither did the plaintiff admit that he was overpaid in any sum, but the contrary; and he appears to have refunded this $497 only because he was constrained to do so in order to obtain the payment of the claims then due him from the government. Griswold's representation that the plaintiff was then prohibited from prosecuting claims as an attorney in the department was true; but that order did not include and ought not to have prevented him from collecting a claim as assignee, and such was his legal relation to this one from March 18, 1874. Besides, the order disbarring the plaintiff was improperly procured by the defendant Griswold, whether knowingly or otherwise, and he ought not to be allowed to take advantage of his own wrong.

Owing to the plaintiff's action in regard to his fictitious claims aforesaid, it appears that Griswold endeavored to discredit him at the departments and with his clients in Oregon, and to this end he procured the order disbarring him, and made representations to such clients to the effect that they must sell their claims or take them out of his hands if they ever expected to realize anything on them. Apparently, as a part of this scheme and in Griswold's interest, objections were made in the third auditor's office to paying the plaintiff as assignee according to the duly executed assignments of Cardwell and others, and letters signed by the third auditor were privately addressed to the plaintiff's clients, including Cardwell, inquiring about the assignments to the plaintiff as if they might be fraudulent, and suggesting doubts as to the propriety of paying the claims to Dowell as provided by them. By this means, in addition to what has already been stated, Cardwell and others of the plaintiff's clients became alarmed, and were induced to sell their claims, amounting to several thousands of dollars, to Griswold at a low figure, in disregard of their engagement with the plaintiff and his rights. The evidence shows that Griswold, in buying up these claims, gave as a reason why he could get them allowed, and why he could not afford to pay any more for them than he did, that he had to spend money upon the clerks, and this apparently officious interference by some one on his behalf warrants the inference that this statement was not a mere idle boast or a dealer's device to cheapen the claim. The assignment of the Gridley claim to the plaintiff, although in form and effect absolute, was not so in fact, and was obtained by him in good faith and without fraud or deceit, for the sole purpose of collecting the claim as assignee if not as attorney, and thereby getting the compensation out of it to which he was justly entitled, and for which he had so long and so faithfully labored. On November 19, 1874, a warrant was directed to issue in satisfaction of the Gridley claim for the full amount of $2,580, payable to Griswold, who thereupon received the money from the United States upon it. Under ordinary circumstances, the collection of this claim after the passage of the act making the appropriation to pay it was a matter of comparatively small moment. The great labor, time and expense was incurred in securing the appropriation, because the necessity and integrity of the expedition had been seriously ques-

tioned from the first; and this, as has been stated, was accomplished mainly by the plaintiff. The appropriation being made, there ought not to have been any doubt or question as to the validity or payment of the claim. All that was necessary was to show that the price of the beef was in justice and equity, under all the circumstances, reasonable; and although the price appears to have been very high, no serious objection was made upon that account, because there were plenty of precedents for it among the allowances under the act of July 17, 1854, and the purchases by the regular army under similar circumstances in that region of country. Besides, the fact that the parties had waited for their money seventeen years, without interest, and had been compelled to pledge a large portion of it to defray the expenses of procuring the appropriation to pay it, might well be considered by the secretary of war in making an adjustment and settlement of this claim "on just and equitable principles." But, notwithstanding all this, by one means and another, and without any apparent fault of the plaintiff, the payment of this claim was delayed and obstructed in the department for over three years, to the great injury of the plaintiff and the other parties interested. Directly and indirectly the defendant Griswold appears to have been the principal cause of this delay, and finally, with full notice of all the circumstances, he appears to have taken advantage of them to get the claim transferred to himself, for a little over fifty cents on the dollar, with the intent to deprive the plaintiff of his interest in it, and all compensation for the time, labor and expense bestowed on it in making it available.

Before the execution of the assignment and power of March 18, 1874, by Cardwell, the plaintiff, upon inquiry by the former, told him that his charges would be thirty-three and one-third per centum of the sum collected, and Cardwell then and there assented to the proposition, so that at the time of the sale to Griswold, the plaintiff had a one-third interest in the claim, unless there is something in the law applicable to the transaction which will prevent the acts and doings of the parties from taking effect according to their manifest intentions and the justice of the case. Counsel for the defendant, however, claim that as a matter of fact, the plaintiff was simply employed to collect this claim; that he has no lien upon the fund for his services, and that no part of it was appropriated or assigned to him as a security therefor, or in satisfaction thereof, and therefore Cardwell might dispose of the claim to Griswold, pending its collection, without his consent, and if there is anything due the plaintiff for services rendered, or expenses incurred on account of his agency in the matter, he may bring an action at law against Cardwell. wherein he can recover damages commensurate with the injury sustained, if

any. But upon the proof there can be no doubt that under the contract and power of attorney of November 21, 1871, the plaintiff, as agent or attorney in fact of Cardwell, had a lien upon the fund in the treasury of the United States for his compensation earned, which Cardwell could not divest or ignore. Story, Ag. §§ 372, 476. But under the irrevocable power and absolute assignment of March 18, 1874, there was at least an equitable assignment to the plaintiff of one-third of the amount to be realized on the claim, as a compensation for his past services and expenses in procuring the appropriation and those yet to be rendered or incurred in obtaining its allowance. This was not a mere agreement by Cardwell to pay the plaintiff when the claim should be allowed, or out of this fund when it should be received by him, but an actual appropriation of so much of the same to the plaintiff, so that the United States was thereby authorized to pay the amount directly to him without the further intervention of Cardwell. The case comes directly within the rule laid down by Lord Truro, Ch., in Rodick v. Gandell. 12 Beav. 325, cited in 2 White & T. Lead. Cas. Eq. 406. "The extent of the principle," said his lordship, "to be deducted from the cases is, that an agreement between a debtor and a creditor that the debt owing shall be paid out of a specific fund coming to the debtor, or an order given by a debtor to his creditor upon a person owing money or holding funds belonging to the giver of the order, directing such person to pay such funds to the creditor, will create a valid, equitable charge upon such fund; in other words, will operate as an equitable assignment of the debts or funds to which the order refers;" and also the supreme court in Murray v. Gibson, 15 How. [56 U. S.] 420; Wright v. Ellison, 1 Wall. [68 U. S.] 22; and Trist v. Child, 21 Wall. [88 U. S.] 447. In the first of these cases, the court say: "The evidence proves that the complainant was to receive a contingent fee of five per centum out of the fund awarded, whether money or scrip. This being the contract, it constituted a lien upon the fund, whether it should be money or scrip. The fund was looked to, and not the personal responsibility of the owner of the claim." In the second case, the court, in speaking of the doctrine of equitable assignment, say: "It is indispensable to a lien thus created that there should be a distinct appropriation of the fund by the debtor, and an agreement that the creditor should be paid out of it." In the third case, the court say: "It is well settled that an order to pay a debt out of a particular fund belonging to the debtor gives the creditor a specific equitable lien upon the fund, and binds it in the hands of the drawee. A part of the particular fund may be assigned by an order, and the payee may enforce payment of the amount against the drawee. But a mere agreement to pay out of such fund is not sufficient. Something more is necessary. There

must be an appropriation of the fund pro tanto, either by giving an order or by transferring it otherwise in such a manner that the holder is authorized to pay the amount directly to the creditor, without the further intervention of the debtor."

But admitting the facts of the transaction and the intentions of the parties to be as herein stated, the defendant still maintains, that the plaintiff never had any legal authority to collect this claim, and could not acquire any lien upon or interest in the fund out of which it was payable, because of the prohibitions contained in section 3477 of the Revised Statutes, and, therefore, Cardwell might lawfully dispose of it to Griswold, as he did, free from any demand or right·upon the part of the plaintiff. This section is composed of the act of July 29, 1846 (9 Stat. 41), and section 1 of that of February 25, 1853 (10 Stat. 170), and substantially provides that "all transfers and assignments" of any claim upon the United States or any interest thereon, and all powers or other authorities for receiving payment of any such claim are "absolutely null and void," unless made among other things, "after the allowance of such claim, the ascertainment of the amount due and the issuing of a warrant for the payment thereof." To show that a warrant of attorney to collect and receive a claim may be made under the act of 1846, supra, at any ·time after provision has been made by act of congress for its payment, plaintiff ·cites Opinions of Attorney General (volume 6, p. 60). But the ground for the ingenious ·distinction taken in that case between "a ·warrant of attorney" and "a transfer or ·assignment" no longer exists. The acts of 1846 and 1853, supra, as consolidated and revised in section 3477, supra, put "warrants of attorney" and "transfers and assignments" upon the same footing. Either, if made with reference to a claim upon the United States within the purview of this section, before "the issuing of the warrant for the payment thereof" is "absolutely null and void." Still the Revised Statutes, as such, not being in force prior to December 1, 1873, the warrant of attorney given to the plaintiff under the act of 1846, on November 21, 1871, was, upon the authority of the opinion supra, undoubtedly valid. On account of the agency thereby created and as a security for the services of the agent the law imposed a lien upon the fund in favor of the plaintiff for his compensation, his commissions, advances and expenses. But the power and transfer of March 18, 1874, being made after the Revised Statutes took effect, if within the scope of section 3477, is void. But my impression is that the section is not applicable to any of these claims. In my judgment "a claim upon the United States" is something in the nature of a demand for damages arising out of some alleged act or omission of the government, not yet provided for or acknowledged by law. As the

term imports, it is something asked for or demanded on the one hand and not admitted or allowed on the other. Worcester and Bouvier, verba "Claim." When the demand is admitted, authorized or provided for by law it is not a mere claim, but a debt. It no longer rests in mere clamor or petition, but is something due upon which an action may be maintained.

This demand had its ostensible origin in the order of Governor John W. Davis, a United States officer, and then commander in chief of the militia of Oregon territory. It arose out of a contract in due form with an officer of that militia in pursuance of such order, and was afterward, in pursuance of the joint resolution of the territorial legislature, passed January 26, 1855, directly recognized by the United States by the passage of the act directing its adjustment and settlement by the secretary of war, and its payment out of the treasury. There is ground, then, for the argument of the plaintiff that the demand was a debt from the beginning, and never a mere claim or assertion. But by the acts of 1854 and 1871, supra, it was provided that these claims should be adjusted on "just and equitable principles" and paid accordingly. Thereafter, if not before, they were debts and not mere claims. Besides this, legislation seems to recognize the right of the assignee, who is in equity the owner, and entitled to receive the money. It must have been known to congress that the vouchers for the supplies furnished to the expedition of 1854 had in many instances changed hands. To equitably adjust and settle these claims involves the determination of who is entitled to the payment therefor. This seems to have been the construction placed upon the act by the department. The evidence shows beyond a doubt that claims growing out of the Rogue River war of 1853, the expedition of 1854, and the general war of 1855-6, were constantly paid to attorneys and assignees upon powers and transfers made before the issuing of the warrants, or even before the act making the appropriation for their payment. Indeed, the very assignment upon which Griswold received the amount of the Gridley claim was made to him more that six months prior to the issuing of the warrant therefor. This being so, even if the case was within the statute as between the parties and the United States, Griswold, having obtained this money in violation of or contrary to it, ought not to be allowed to set it up in this suit to prevent the plaintiff from recovering that portion of it which in equity belongs to him.

The defendant also objects, that if the defendant is entitled to recover at all, his remedy is at law, and therefore this court is without jurisdiction. The pleadings in this case were not reformed after its removal to this court. The answer to the complaint contains a plea to the jurisdiction, along with

matter to the merits. But a party who desires to object to the jurisdiction of this court, must do so by plea before answering to the merits; and if he pleads such a plea with one to the merits, it will be treated as waived or abandoned. Chapman v. School Dist. [Case No. 2,607]; Murray v. Gibson, supra; S. C. Eq. Rule 39. For this reason, the defendant is not entitled to make this objection at this time. But if this were otherwise, it would not affect the result. There is no doubt but that the plaintiff might have maintained an action at law against the defendant, upon these facts, as for money had and received to his use. But it being determined that the plaintiff had a lien upon the fund, which accompanied it into the hands of the defendant, equity has jurisdiction also. Story, Eq. Jur. § 1044; Bradley v. Root, 5 Paige, 640; Murray v. Gibson, supra; Trist v. Child, supra. The latter case is particularly in point. There the court found, upon the evidence, that the plaintiff had no lien, because the transaction only amounted to a personal agreement between the parties, and therefore there was no jurisdiction in equity, saying: "If there was no lien, there was no jurisdiction," which plainly implies the converse of the proposition—if there is a lien, equity has jurisdiction.

The defendant also pleads that this demand was not presented to Cardwell, as administrator, for allowance, as provided in sections 374 and 468 of the Oregon Civil Code, and therefore this suit cannot be maintained. If this were so, the fact would not be a bar to the right, but only abate this suit. Hentsch v. Porter, 10 Cal. 557. But the allegation being pleaded with matter to the merits. is therefore to be considered waived and abandoned. But if this were otherwise, the plea is not good. So far as Griswold is concerned, this is not a claim against the estate of Gridley, but against himself upon a liability arising out of his own conduct—the obtaining this money from the United States, upon which the plaintiff had a lien. if not by fraud, at least wrongfully and with notice of the facts. For this reason, it matters not whether the demand was presented to Cardwell, for allowance, or not, or whether he, as administrator, is even liable for it or not. Even so far as Cardwell is concerned, correctly speaking this is not a demand against the estate, because of the liability of the intestate, but a demand against the administrator, on account of a liability incurred by him in the administration of the estate. An administrator may incur expenses, including attorney's fees, in the administration of an estate, for which he shall be allowed in his settlement. Civ. Code Or. § 1146. I doubt whether such demands are within the purview of section 374, supra, and must therefore be verified and presented for allowance or rejection, by the administrator, before an action can be maintained against him to enforce them. However this may be, such allowance or rejection

can in no way affect Griswold's liability in the premises. There must be a decree for the plaintiff for the one-third of the fund received by the defendant—$860—with legal interest upon the same from the time he received it at the treasury of the United States, together with his costs and expenses in this suit.